HEARD APRIL TERM, 1873.

## PICKENS *vs.* DWIGHT.

In April, 1863, a Master in Equity received payment, in Confederate currency, of a bond, secured by mortgage of real estate, which, in June, 1861, he had taken under a decree of the Court, and which he held for the use of a party to the cause in which it was taken : *Held,* That the Master was not liable as for a breach of trust.

The conclusion reached by the Court in *McPherson* vs. *Lynah and Gray,* 14 Rich. Eq., 121, approved, but not the reasoning of the Court.

The measure of a Master's liability for the funds of suitors in his custody is not that of a technical trustee. He is the financial agent of the Court, and the extent of his liability must be determined by the practice and course of the Court in similar cases.

BEFORE GRAHAM, J., AT CHARLESTON, JUNE TERM, 1872.

This was a bill in equity, filed in September, 1866, by Thomas J. Pickens and wife against Isaac M. Dwight, James Tupper and others, and revived in 1869 against the executors of Mr. Tupper, who had died in the meantime. The facts of the case are stated in the decree of the Circuit Judge, which is as follows :

GRAHAM, J. The facts in this case are fully set forth in the pleadings, from which it appears that the defendant, Isaac M. Dwight, in September, 1858, contracted to purchase a plantation in St. Paul's Parish, Colleton District, to an undivided moiety, of which the plaintiffs, Pickens and wife, were entitled, and the defendants, Mrs. Perry and her sons, J. Allen Miles and Jeremiah Miles, to the other moiety, for the sum of $5,000, and made a partial payment on account, and entered into possession ; but finding legal difficulties in making sufficient titles, he filed a bill in the Court of Equity for Charleston District against the plaintiffs and their co-tenants of the land to enforce the agreement and perfect the title. The bill was filed on the 31st of October, 1860, and, all parties having answered, a decree was made in the cause on the 22d day of May, 1861, directing Mr. Tupper, then one of the Masters of the Court, to convey the said plantation to Mr. Dwight, in fee simple, in accordance with the contract, allowing him credit for the amounts already paid by him on account, upon his executing his bonds for the balance of the purchase money. The decree further directed that, after payment of taxes and the costs of suit, one-half of the residue of the proceeds of sale, including therein $1,000 already paid to him by Mr. Dwight, should be paid to Thomas R. Waring, trusteee of Mrs. Perry, and to her two sons, J. Allen and J. J. Miles, to be equally

divided between them, and the other moiety, including $500 already paid by Mr. Dwight to Thomas J. Pickens, should be paid to John M. Pickens, to be held by him upon the uses and trusts set forth in the answer of Mrs. Pickens, provided he should first enter into bonds to said Master, with approved sureties, in double the amount paid to him, for the faithful discharge of his duties as trustee.

On the 4th June, 1861, Mr. Dwight, at the request of the parties, and for their accommodation, paid $500 more of the purchase money in cash, and executed to the Master four (4) bonds, secured by a mortgage of the plantation, conveyed to him, for the balance of the purchase money, $3,000. Three of these bonds were for $500 each, and were assigned by the Master to T. R. Waring, trustee of Mrs. Perry and the two Miles', respectively, on the 7th of February, 1862.

It was admitted at the hearing that, subsequently to the filing of the original bill in this case, these three bonds were for the proceeds of sale of the same plantation which was sold in 1867 under foreclosure of a second mortgage given by Mr. Dwight to Street. The original assignees of these bonds, parties defendant to the original bill, were, therefore, not now before the Court, nor has the purchaser at said sale, under forclosure of the said mortgage, been made a party to this suit. The plaintiffs, Pickens and wife, were not made parties to the proceedings for foreclosure of the second mortgage, because the original mortgage of Dwight to the Master had been satisfied, as to their interest therein, under the circumstances now to be stated:

John M. Pickens never qualified as trustee of his mother, Mrs. Pickens, by giving security to the Master, and never applied to the Master for an assignment of the fourth bond of Dwight to the Master for $1,500, being Mrs. Pickens' share of the purchase money; and the said bond, therefore, remained in the hands of the Master, the obligee, unassigned, until the 29th April, 1863. At that date, the bond being past due, Mr. Dwight paid to the Master, Mr. Tupper, $1,710.51, being the amount of principal and interest then due on said bond, in Confederate States Treasury notes, and the bond was delivered up to him, and a satisfaction *pro tanto* entered on the mortgage by the Master. Of this payment it appears the complainants had no notice until after the 26th of April, 1866, the date of Mr. Dwight's letter to Thomas J. Pickens. The sum of $1,710.51, so received by

the Master, was deposited by him in the Bank of the State of South Carolina to the credit of the case of Dwight vs. Pickens, as required of him by law; and was, subsequently, invested by said Master in $1,555 Confederate States 8 per cent. bonds, which he held as assets of the same cause, subject to the order of the Court.

The original bill in this case was filed on the 6th of September, 1866, to cancel the receipt and satisfaction of Master Tupper, and to set up the original bond and mortgage, and to foreclose the same; and failing in that, then to make Mr. Tupper personally liable for the amount thereof.

After all the defendants to the original bill had answered Mr. Tupper died, and this bill was filed on the 14th July, 1869, to revive the suit against his executors. The executors of Tupper not having filed an answer to the bill of revivor, and having since, as they alleged, fully administered his estate, which was not sufficient to pay his specialty debts, an order was made at the hearing, with consent of plaintiff's attorney, allowing them now to answer the bill of revivor, exhibiting their administration of the estate of their testator, accompanied by certified copies of the inventories and appraisement, and the executor's account.

So far as the bill seeks to set up the bond and mortgage against the obligor and mortgagor, Isaac M. Dwight, it is clear that it cannot be sustained, for they were satisfied by the person having the legal title and right to receive, the obligee and the mortgagee; and unless there was fraud or collusion between him and the obligor, they must be held to have been paid. This precise point was decided by the present Supreme Court, in the case of *Mayer* vs. *Mordecai*, 1 S. C., 383, and the case of *Creighton* vs. *Pringle*, Supreme Court, November Term, 1870.

So far as the bill seeks to make the estate of the deceased Master liable for receiving payment in Confederate currency of a bond past due, given to him for the purchase money, and remaining in his hands under order of the Court, it is identical with the case of *McPherson* vs. *Linah and Gray*, decided in 1866, and reported 14 Rich. Eq., 121. The only points of difference between this case and that are as to time, and are in favor of the defendants in this case. In *McPherson* vs. *Lynah and Gray*, the bond was given in 1860, and the payment to the Master was on 30th January, 1864, while in this case the bond, although given in payment of a contract of purchase made in 1858 was not executed until the 4th of June,

1861, and on that day $500 more in cash than the contract called for was paid by Dwight, at the request of the parties in interest, though in what currency does not appear. The payment to the Master was on the 29th April, 1863, Confederate currency then having a far greater purchasing value than it had on 30th January, 1864.

If, then, the case of *McPherson* vs. *Lynah and Gray*, is law, it is .conclusive of this case, and the relief sought against the executors of the late Master must be refused.

It was contended by the plaintiff's counsel that the decision in *McPherson* vs. *Lynah and Gray* has been virtually overruled by the decisions of the present Supreme Court, in the cases of *Mayer* vs. *Mordecai*, and *Creighton* vs. *Pringle*, already referred to, and in the case of *Fitzsimons* vs. *Fitzsimons*, 1 S. C., 400. But the two first cases were rested by the Court, upon the construction of the instruments creating the trusts, and the trustees were held liable as for breach of trust in receiving payment of bonds held by them as trustees, in Confederate currency, such receipt not being within the scope of their powers, because not in compliance with the requisitions of the settlements, which were necessary conditions to the legal exercise of the power, in the one case " upon consultation " with the *cestui que trust*, and in the other upon her " written consent." In the case of *Fitzsimons* vs. *Fitzsimons*, an administrator *cum testamento annexo* was held to have committed a *devastavit* in calling in a bond well secured by real estate left by his testator, and receiving payment in Confederate currency, when the money was not needed for the purposes of administration, because it was incumbent on him to show the reasonableness of his conduct in disturbing an investment acknowledged to be good. In the case of *Nance* vs. *Nance*, 1 S. C., 209, the distinction is pointed out as to the liability of trustees who " exceed the limits of their discretion," and their liability " for errors of judgment in cases where they have a right to the exercise of a discretion," and recognizes the rule which relieves them from liability for losses where they have acted in good faith, and with ordinary care and prudence, provided they have acted within the limits of their descretion.

In the case of *McPherson* vs. *Lynah and Gray*, the Court held that the receipt by the Master was, under the circumstances, a fair and legitimate exercise of his discretion, and that, too, " within the line of his duty." In that case, too, the Court laid stress upon the fact that the parties interested could have prevented the receipt of

the money; in this case plaintiffs, who were the parties entitled to the bond, could, at any time, have taken it out of the hands of the Master, by procuring the qualification of their trustee, or the appointment of another. Their failure to take any steps to this end may, perhaps, be partly explained by the fact shown by the pleadings that the plaintiff, T. J. Pickens, had already received $500 of the purchase money which he was ordered to pay over to the trustees, when qualified.

All the authorities cited by plaintiff's attorney, in argument, were upon the liability of express trustees, while the case of *McPherson* vs. *Lynah and Gray* is the only case which has been decided by our Court as to the responsibility of a Master in Equity, whose duties and responsibility, as it is well contended by defendant's attorney, is not, in such a case as the present, to be measured by the rule applicable to trustees but by the rule which regulates the duties and responsibility of a ministerial officer of a Court, which not only recognized and authorized payments in Confederate currency, but in certain cases even directed the sale of the property of minors and its investment in Confederate securities.

It is, however, enough for me that the case of *McPherson* vs. *Lynah and Gray*, although assailed in argument before the Supreme Court, has not been expressly overrruled, and is therefore a controlling authority upon this Court until it is. And although the present Supreme Court might decide the question in that case differently if it was *res integra,* they may yet well hold that, having been so decided, they will in this case respect the maxim "*stare decisis,*" as being in the interest of peace, because "*interest rei-publicae ut sit finis litium.*"

The bill is dismissed.

The complainants appealed, and moved to reverse the decree on the following grounds:

1. Because Mr. Dwight had no right to require Mr. Tupper to receive payment of his bond in any other than constitutional currency. Mr. Tupper, by receiving Confederate bills or notes and cancelling the bond held by him only for others, committed a breach of trust, and made himself liable for the loss which followed.

2. Because there is not only no proof that the complainants ever acquiesced in the payment in Confederate notes, but there is no proof that either of them ever heard of the transaction until a short time

before the filing of their bill, and it never was their duty to caution Mr. Tupper against receiving a currency which Mr. Dwight had no right to require him to take.

3. Because in releasing Mr. Dwight from his obligation to pay $1,710 in constitutional currency in consideration of $1,710 in Confederate notes, worth at the time about $450, Mr. Tupper did not exercise the same care, diligence and caution which a prudent man would do in the management of his own funds.

4. Because, under the order of Court of Equity of the 22d May, 1861, Mr. Tupper's only authority was to hold Mr. Dwight's bond for the complainants until the trustee should accept and give security, and though perhaps the order did not mean that the bond should not be paid when it became due—if the trustee did not comply with it—it nevertheless means that it should not be paid in a depreciated currency which the obligor had no right to require the obligee to receive.

*DeTreville* and *Noble*, for appellants, contended that the receipt of the Confederate money was a breach of trust for which the Master was liable to the plaintiffs, and that, upon this point, *McPherson* vs. *Lynah and Gray* had been overruled by the later cases. They cited the cases in the Circuit decree, and *Sanders* vs. *Rodgers*, 1. S. C., 452; *Allen* vs. *Gaillard*, 1 S. C., 279; *Houseal* vs. *Gibbs and Patterson*, Bail. Eq., 485; *Mulligan* vs. *Wallace*, 3 Rich. Eq., 111; Act 1839, 11 Stat., 161; *Glover* vs. *Glover*, McM. Eq., 153; Wms. on Ex'ors, 1291; *Wamack* vs. *Austin*, 1 S. C., 440; *Head* vs. *Talley*, Amer. Law Times, September, 1870, p. 156; and *Thorington* vs. *Smith and Hartley*, 8 Wal., 1.

*Miles*, with whom was *McCrady*, cited *Bulow* vs. *Witte*, 3 S. C., 308; Lewin on Trusts, 513; *Tollee* vs. *Croft*, 7 Rich. Eq., 45; *Neely* vs. *McFaddin*, 2 S. C., 173; *Lowndes* vs. *Pinckney*, 1 Rich. Eq., 164; Act 1791, 7 Stat., 258; Act 1806, 5 Stat., 526; Act 1821, 7 Stat., 323; Act 1840, 11 Stat., 113; *Comer* vs. *Hollinshead*, 2 Ver., 90; *Fenwicke* vs. *Gibbes*, 2 DeS., 94., *Thompson* vs. *Wagner*, 2 DeS., 94; and *Pollock* vs. *Dubose*, 7 Rich. Eq., 20. He also referred to several orders of the Circuit Court made in the years 1862–'3–'4, in cases to which minors were parties, directing sales of property for cash and investments of the proceeds in Confederate bonds. These were cited to show the practice of the Court in reference to Confederate money.

Aug. 14, 1873.   The opinion of the Court was delivered by

MOSES, C. J.   The bill seeks to set up the bond and mortgage against the obligor and mortgagee, Isaac M. Dwight, and failing in that, then to make Mr. Tupper, the late Master, liable therefor. So far as the pleadings have been brought to our notice, no liabilty is charged against him for the conversion of the Confederate Treasury notes received by him into Confederate bonds, nor do the grounds of appeal allege error in the Circuit decree for not holding him responsible for such change.   Although one of the objects of the bill was to have the original securities set up against the obligor and mortgagee, the refusal to do so by the Court below is not charged as error asked to be corrected by this Court.   In fact, the first ground on which the reversal is claimed assumes that the cancellation of the bond was a breach of trust, for which he is responsible.   Our judgment will be restricted to the points made in the notice of appeal.

Whatever doubts may have been entertained in regard to the case of McPherson vs. Lynah and Gray, 14 Rich. Eq., 121, as a binding authority, it has now been directly impugned, according to the mode permitted by our practice, and it is, therefore, our necessary duty to enquire whether it is to be considered a decision which we are bound to follow.   While we cannot adopt the argument on which the Court founded its judgment, our examination leads us to the same result.   If we regarded Mr. Tupper, the Master, a trustee, as the Court there did Mr. Gray, who occupied a like position, we do not see how a different rule could be applied to him than to any other trustee, charged with a breach of duty, by converting, without any adequate and sufficient reason, a security, admitted to be good and valuable, into one which, in open market, and with the most careful endeavor, could not be made productive of a value in any way approximating that for which it had been substituted.   More especially would the breach be without excuse, if the new security was of the class least favored by the Courts for investments, and it would be without the shadow of extenuation, if the change was made for Confederate notes, which, when compared with gold and silver coin or national bank issues, had not only a depreciated value, but one daily fluctuating with the probable success or failure of the government which had issued them, and, to any ordinary understanding, ultimately entirely worthless, unless

the civil war which it was waging could resist the arms and powers of the United States, which were brought into requisition for its suppression.

· Trusts are various. A debtor may be said to be a trustee for his creditor ; a bailee is certainly one for his bailor, and an agent for his principal. Breaches of obligation in these relations may be relieved in the Courts of law. The rules which equity prescribes for the administration of a technical trust cannot, to their full extent, apply to them. A Master in Equity, in regard to the bonds committed to his charge, is the ministerial officer of the Court—the custodian of the treasury, holding it under its supervision, and disposing of the securities confided to him, under its direction, and in conformity with its course of proceeding ; not only subject to its punishment for any wrong appropriation, or improper dealing, but responsible also to the party to whom loss may therefrom ensue. He does not hold the money in his hands as a trust, in the technical sense of the word, but as the financial agent of the Court, and where he has received it on a sale under proper authority, he stands in no different relation to it than a Sheriff or a Referee who has made it under proceedings in a Court of law. Money there paid goes into the care of the Court, and is held subject to its order ; and yet he cannot be considered a trustee in the meaning in which the term is sought to be applied to the Master in the argument here. There may be cases in which the terms of the order might constitute him a trustee, and require of him all the duties, and impose on him all the obligations, which, in equity, attach to the position, as in *Houseal* vs. *Gibbes & Patterson*, Bail. Eq., 485, where he was directed " to apply the interest of the proceeds, and as much of the principal as might be necessary for the maintenance and education " of the person named, " and to improve the surplus at interest, or invest in public securities."

The Master (Mr. Tupper) was the officer of a Court, in a State which satisfied all its obligations and engagements with Confederate currency, and accepted it in payment of debts due to it, without question as to the time when they were contracted. He was required to deposit all money received by him in his official character in the Bank of the State, (7 Stat., 223; 11 Stat., 113,) and that institution dealt exclusively in the prevailing currency, so far as its payment of deposits was concerned. It has been shewn in the argument that the Court recognized the currency, by ordering sales

for cash where no other medium existed, and directing stocks of a bank in Charleston of good repute, and State and city bonds, to be sold by the Master, and the proceeds invested in bonds or stocks of the Confederate States. At least one instance is known to a member of the Court, long a practitioner in the State, where the Court of Equity instructed the Commissioner to invest money received on a bond in which minors were interested, and which was secured by a mortgage of real estate, in the bonds of the Confederate Government. The notes accepted by Mr. Tupper " were used as money in nearly all the business transactions of many millions of people. They must be regarded, therefore, as a currency imposed on the community by irresistible force by a government, obedience to whose authority in civil and local matters was not only a necessity but a duty. They were the only measure of value which the people had, and their use was a matter of almost absolute necessity." —*Thorington* vs. *Smith*, 8 Wallace, 11, 12, 13. See, also, opinion of Mr. Justice Willard, in *Neely* vs. *McFadden*, 2 S. C., 173–4. Should the Master, the mere officer of the Court, be held liable for doing that which had the implied sanction of the Court in its own mode of dealing with such notes? Was not the recognition of the currency, by receiving it at par value, on the sale of even the estates of minors, a sanction for the act of the Master in the case before us? Was it, in the line of his duty, a prudent one, consistent with an honest and faithful discharge of it? The Court of which he was the officer had prescribed the course which, under the like circumstances, he should adopt, by commending it through its own example. And yet it is sought, through the equitable jurisdiction of the Court, to hold him responsible for an act which the tribunal of which he was the officer could not have considered a breach of duty; for it was in perfect consistency with its own order of proceeding.

The motion is dismissed.

*Wright*, A. J., and *Willard*, A. J., concurred.